[Nos. 33145, 33146. Department One. September 8, 1955.]

CARSTENS PACKING COMPANY, *Appellant,* v. WYLIE COX *et al.,*
*Respondents.*

CARSTENS PACKING COMPANY, *Appellant,* v. PAUL
THOMPSON *et al., Respondents.*[1]

[1]Reported in 287 P. (2d) 486.

*Eisenhower, Hunter, Ramsdell & Duncan,* for appellant.

*Gavin, Robinson & Kendrick* and *Blechschmidt & Mc-Kenzie,* for respondents.

DONWORTH, J.—The principal issue involved in this consolidated action is the amount of compensation which two cattle feeders are entitled to recover for feeding and caring for certain beef cattle belonging to Carstens Packing Company during the 1952-1953 season. Carstens Packing Company (hereinafter referred to as Carstens) had previously, in the fall of 1951, placed other beef cattle in the care of Wylie Cox, whose feeder yard was located near Prosser, Washington, and with Paul Thompson, whose feeder yard was located near Granger, Washington.

Under the 1951 contract between the parties, the feeders were to feed and care for the animals until they were ready for slaughter (i.e., until the animals had developed to the point where upon slaughter their carcass would dress-out as "choice" grade beef, or better, according to government standards). Under the 1951 contract, the amount of compensation to the feeders for their services was determined by multiplying the added weight acquired by each of the animals while in their care by the sum of thirty-five cents per pound. This arrangement worked to the satisfaction of all parties.

In the fall of 1952, Cox and Thompson again desired to feed cattle for Carstens under a similar contract. They discussed the matter with Carstens' representative but were not promised any cattle or contract. About the middle of September, this representative notified Thompson by telephone that he and Cox were to be given cattle for feeding again that year. Without further discussing the matter with the feeders, Carstens, on September 25 and 26, 1952, de-

livered 231 head of cattle to the Thompson yard and, without any prior notice whatsoever to Cox, delivered .235 head of cattle to his yard.

The feeders accepted the cattle thus delivered to their respective yards and commenced to feed and care for them. They requested a written contract from Carstens' representative, and he promised them such a contract. The contemplated contract was to be identical in all respects with the 1951 contract, with the exception that the rate of compensation was to be thirty-seven instead of thirty-five cents per pound of gain. The feeders requested that Carstens furnish them with the scale weight of each truckload of animals (hereinafter referred to as the in-weight) that was delivered to their yards. The Carstens' representative, however, furnished each feeder with only the total weight of the herd delivered to each.

In late December, 1952, each feeder called upon Carstens to remove those animals in his yard which had attained the grade of "choice." Carstens' representative was of the opinion that none of the animals were up to that grade and did not remove any cattle from the yards until sometime in January, 1953. On January 31st, there remained in the Cox yard 205 head of cattle, and in the Thompson yard 174 head of cattle. In the months of February and March, additional deliveries were taken from each yard.

On or about March 25, 1953, when there remained seventy-two head of cattle in the Cox yard and sixty-six head in the Thompson yard, the feeders filed, in their respective counties, agister's liens upon the animals then in their custody for amounts they claimed to be due and owing to each of them by Carstens.

Carstens commenced an action against each feeder and the sheriff of their respective counties, seeking to restrain the contemplated sheriff's sale pursuant to foreclosure of the lien. A temporary restraining order was issued and also an order to show cause why the sale of the cattle should not be enjoined *pendente lite.* Carstens, to prevent the sale of the cattle at a sheriff's sale, deposited cash in escrow in a bank in lieu of the cattle pursuant to a stipulation of the parties, and

was then allowed to remove the cattle to its slaughter house in Tacoma.

Each feeder answered and cross-complained, seeking recovery from Carstens of the amount each claimed in his agister's lien. The Thompson case was, by stipulation of the parties, transferred from Yakima county to Benton county, and, by further stipulation of the parties, the two cases were tried together.

The theory of the cases adopted by the trial court was that the feeders were under a contractual obligation to bring the stock entrusted to their care to a grade of "choice"; that for such services they were to be compensated at the rate of thirty-seven cents per pound of gain; that each feeder did bring all of the stock in his care to this grade no later than January 31, 1953; that at that time Carstens breached its contracts by failing and refusing to take delivery of the entire herd from each yard on or before that date; that each feeder should be allowed recovery under the contract for services rendered to and including January 31st, and that he should also recover the reasonable value of services rendered subsequent to that date. This reasonable value was determined by the allowance of (a) a charge of twelve cents per head per day for each day an animal was left in the custody of the feeders after January 31st, (b) the cost of the various expendable items consumed, such as feeding and bedding, etc., and (c) the labor expense incurred by the feeders in caring for the cattle subsequent to that date. From a judgment consistent with this theory entered in favor of each of the feeders, Carstens appeals.

At the close of the case, the trial court rendered an oral decision (nine pages in the statement of facts) in which it discussed in detail the credibility of the various witnesses and the weight to be given their testimony as to the principal issues in the case. The issue of fact as to when an animal has reached the point where it will be graded as "choice" cannot be determined with absolute certainty until it has been slaughtered. Therefore, the court was forced to rely on the testimony of witnesses who had observed the cattle and were experts in this field. After hearing the experts

produced by both parties, the court, holding that respondents' witnesses were more convincing than appellant's, determined that all the animals had attained the required grade by January 31, 1953.

Several months after the end of the trial, findings of facts were presented to the court. At that time, the court rendered a second oral decision in which it discussed in detail the various items which should be included in the computation of the "reasonable value" of the services rendered by respondents subsequent to January 31, 1953. The findings of fact and conclusions of law were not entered until some six weeks later.

Appellant's nineteen assignments of error may be divided roughly into the following groups: (a) The court erred in finding that there was a breach of the contract by appellant, (b) that the court failed to find that if such breach did, in fact, occur, respondents had waived the same by denying appellant a reasonable opportunity to correct such breach, (c) that the court is, in effect, allowing recovery on the terms of the contract and on the basis of *quantum meruit* at the same time, and (d) that various computations made by the court are improper and incorrect because they either include items not sustained by proper evidence, or have not allowed appellant proper credits as offsets.

The evidence showed that such beef cattle should, and would have, if given proper care and feeding, normally attain the grade of choice within the period of 90 to 120 days after being placed in the feeder's yard. On the issue of fact as to whether respondents properly fed and cared for the cattle, the trial court made a finding that the animals were so cared for and did, in fact, attain the grade of choice by January 31st. The 1951 contracts contained this clause:

"The Feeder agrees to feed said cattle for a period until such cattle grade CHOICE . . . It is understood that the Owner will receive these cattle back at a mutually agreed upon time after they grade AA [choice], and it is also mutually understood between the Owner and Feeder that cattle shall be delivered back to the Owner with a reasonable weighing condition. . . ."

 Carstens argues that this clause gave it the equivalent of the sole right to determine when to take the cattle, because Carstens could refuse to "mutually agree" and, therefore, the finding of a breach of the contracts was erroneous. We do not agree with this interpretation of these contracts. It was Carstens' duty to remove the cattle from the feed lots as soon as the terms of the contracts were complied with. A reasonable period of delay in taking back the cattle might be without liability, but the owner must be held liable for an extended delay (such as existed in this case) which caused substantial and unnecessary expense to the feeder. The exact time when a certain live animal has so developed as to be graded a choice by the government inspector after its slaughter is a matter of expert opinion. There was expert testimony, which the trial court believed, to support the findings that all the animals had so developed by January 31, 1953, and that they had been properly fed and cared for by the feeders. We cannot say, from our examination of the record, that the evidence preponderates against these findings nor, if the contract clause above quoted be interpreted as we have indicated, that the court erred in finding a breach of the contract occurring as of that date.

Appellant's argument that, if the breach existed, it was waived by the feeders by not allowing Carstens a reasonable opportunity to correct such breach, is without merit. The only manner in which Carstens could correct the breach was by taking delivery of the cattle when they had reached the condition prescribed in the contract, and this it failed to do within a reasonable time after the cattle reached choice grade.

 Carstens' argument that the court is allowing recovery according to the terms of the contract and on the basis of *quantum meruit* both at the same time is, likewise, without merit. The court, in its second oral decision, went into great detail in stating the basis upon which it computed the items for which recovery was to be allowed. There was no double recovery in this case. Nor was it improper for

the court, in a case of equitable recognizance, to allow recovery based on the contract for the breach thereof and on *quantum meruit* subsequent to said breach. When equity assumes jurisdiction over the subject matter of an action and the parties to be affected by its decree, it will retain jurisdiction for all purposes and grant whatever relief the facts warrant. *Hubbell v. Ward,* 40 Wn. (2d) 779, 246 P. (2d) 468.

As the cattle were taken by Carstens from the yards, each truck load was weighed to determine the out-weights of the animals taken. With the exception of the final deliveries taken from each yard (after the cash had been deposited in escrow), Carstens mailed checks to each feeder in amounts computed on the basis of thirty-seven cents per pound for the gain of each animal.

There was testimony that, after January 31st, the feeders continued to feed and care for the animals as they had previously done, and that these animals should continue to gain in weight until they would eventually attain the grade of prime. To compensate for this gain in weight achieved after January 31st, the trial court attributed ten per cent of the out-weight of each animal (taken after that date) as having been acquired subsequent to that date, and did not allow the feeders any recovery under the terms of the contract for this ten per cent. Appellant complains that this ten per cent figure is purely arbitrary and not supported by any competent evidence.

The gain in weight of these cattle attributable to the period subsequent to January 31st, is, perhaps, incapable of exact computation, but the evidence showed that the cattle continued to gain some weight after that date. The exact weight gain of any specific animal was impossible of ascertainment because appellant furnished only the in-weight *for the entire herd* with which to compare the out-weights for individual truck loads of animals. Under these circumstances, the adoption of average in-weights and out-weights by the court was the only equitable means available. Since none of the animals remaining in the yards on January 31st were weighed on that day, the gain subsequently achieved

was a matter for expert opinion. After the animals attain the grade of choice, the evidence shows that the increase in weight does not continue at the same rate until the grade of prime is reached. The animals, during such period, however, requires as much, or more, feed and care per day than previously given. To allow recovery then only at the contract rate for such period would be to penalize the feeders for the owner's wrongful acts. We do not believe that the adoption of the ten per cent figure by the court was an abuse of its discretion in the interest of equity and justice between the parties.

█ In our opinion, the evidence does not preponderate against any of the findings of fact, and therefore we must accept them as verities. *Corbett v. Ticktin,* 43 Wn. (2d) 248, 260 P. (2d) 895.

The statement of facts in these cases contains over nine hundred pages and more than one hundred exhibits were admitted in evidence. The cases involve a multitude of details and were ably presented by counsel both at trial and on appeal. The trial court in its two oral opinions showed that it had made a complete and thorough study of the items involved. When counsel presented proposed findings of fact, the court said:

"This matter, having been concluded as to the major issue at the time of the trial, by an oral decision of the Court, following which written briefs were submitted, containing the respective computations of the parties as to the amounts due under the formula generally set forth in the Court's oral opinion, comes now before the Court upon the presentation of the Findings of Fact and Conclusions of Law of the respective parties, the Court having indicated to counsel that he would at this time present the Court's conclusions as to the respective computations and the respective amounts due, leaving the matter open to further argument.

"I might save considerable discussion in discussing these items one by one, thereby giving you something to take down, to compute and take exception to. I have considered each one of those items individually and have arrived at a conclusion, and possibly the best way to discuss it is take the defendants' proposed findings of fact and go through them

and make the corrections and the insertions which I have made."

Appellant's comprehensive brief discusses several items which we have not expressly treated in this opinion. We have, however, considered all the errors assigned and are of the opinion that specific reference to each of them would serve no useful purpose.

Appellant has not convinced us that the trial court committed reversible error either as to its findings of fact or as to the rules of law applied by it.

In both cases the judgment appealed from is affirmed.

HAMLEY, C. J., SCHWELLENBACH, WEAVER, and OTT, JJ., concur.

November 16, 1955. Petition for rehearing denied.

